· · · A.

This Opinion
Modifies Opinion

# O-3485

This Opinion
Overrules Opinion

# In part, opinion v C. R Tax

Rated Feb 28, 1932

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

**GERALD C. MANN**
ATTORNEY GENERAL

Honorable James E. Kilday, Director
Motor Transportation Division
Railroad Commission of Texas
Austin, Texas

Dear Sir:

> Opinion No. O-3994
> Re: Does the Railroad Commission
> have authority to put a ceil-
> ing on freight rates to be
> charged by contract carriers?

We have your letter of September 17, 1941, to-
gether with the enclosed memorandum which memorandum is as
follows:

"The Commission's attention is called to
the fact that the Attorney General, 1932, ren-
dered an opinion— and the Rate Division has
been following and is following that opinion—
to the effect that contract carriers may charge
as high rates as they want to charge and that
the only authority of this Commission, acting
through its Rate Division, is to fix a figure
below which they can not go in making charges.

"I have some doubt in my mind as to whether
or not this opinion is correct; and, whether or
not it be correct or incorrect, I should say
that it is against the public interest.

"It is true that we very seldom have a com-
plaint about a contract carrier going too high
with his rates. On the contrary, such complaints
as we receive about them are made by common car-
rier truck and rail lines and are always to the
effect that they are not charging enough.

"What I am trying to say in this memorandum
is that the Attorney General and our Rate Divi-
sion are in accord on the proposition that a

contract carrier can go as high as he wants to in making charges and that the only authority of this Commission is to make sure that they stay high and that this Commission has no authority to put a ceiling on their rates.

"The foregoing is indicated by the attached letter from Mr. McNamee, dated September 4, 1941, addressed to Mr. C. H. Gold, Traffic Manager of the Atlas Powder Company of Wilmington, Delaware.

"I believe that the Attorney General should be requested to reexamine his predecessor's opinion with a view of trying to do something for the people in this matter of rates."

Under these facts you have submitted to us the following question:

Does the Railroad Commission have authority to put a ceiling on freight rates to be charged by contract carriers?

Section 6-aa of Article 911b, Revised Civil Statutes, provides:

"The Commission is hereby vested with power and authority and it is hereby made its duty to prescribe rules and regulations covering the operation of contract carriers in competition with common carriers over the highways of this State and the Commission shall prescribe minimum rates, fares and charges to be collected by such contract carriers which shall not be less than the rates prescribed for common carriers for substantially the same service."

Under the above quoted provision of the Motor Carriers Act it can be readily seen that it is made mandatory upon the Commission to set the minimum rates of contract carriers operating upon the highways of Texas, which rates shall not be less than the rate prescribed for common carriers for substantially the same service. (T. & P. Ry. Co. v. Railroad Commission, 138 S. W. (2d) 927) Under

Honorable James L. Kilday, Director, Page 3

the provisions of this statute standing alone the Commission would have no authority to place a ceiling on rates to be charged by contract carriers but is confined to the power therein given to regulate the minimum rates to be charged by such carrier.

Upon a further examination of the Act in its entirety we find that Section 4-a of Article 911b, Revised Civil Statutes, provides as follows:

"The Commission is hereby vested with power and authority and it is hereby made its duty to supervise and regulate the transportation of property for compensation or hire by motor vehicle on any public highway in this State, to fix, prescribe or approve the maximum or minimum or maximum and minimum rates, fares and charges of each motor carrier in accordance with the specific provisions herein contained, to prescribe all rules and regulations necessary for the government of motor carriers, to prescribe rules and regulations for the safety of operations of each of such motor carriers, to require the filing of such monthly, annual and other reports and other data of motor carriers as the Commission may deem necessary, to prescribe the schedules and services of motor carriers, operating as common carriers, and to supervise and regulate motor carriers in all matters affecting the relationship between such carriers and the shipping public whether herein specifically mentioned or not." (Underscoring ours)

We further find that in Section 1-g of Article 911b the term motor carrier is defined as follows:

"The term 'motor carrier' means any person, firm, corporation, company, co-partnership, association or joint stock association, and their lessees, receivers or trustees appointed by any Court whatsoever, owning, controlling, managing, operating or causing to be operated any motor propelled vehicle used in transporting property for compensation or hire over any public highway in this State, where in the course of such transportation a highway between two or more incorpor-

Honorable James R. Kilday, Director, Page 4

ated cities, towns or villages is traversed; pro-
vided that the term 'motor carrier' as used in
this Act shall not include, and this Act shall
not apply to motor vehicles operated exclusively
within the incorporated limits of cities or towns."

We further find that the term contract carrier
as used in the Act is defined in Section 1-h as follows:

"The term 'contract carrier' means any
motor carrier as hereinabove defined transport-
ing property for compensation or hire over any
highway in this State other than as a common
carrier."

It will be noted that in Section 4-a of Article
911b, above set forth, it is provided, among other things,
that " the Commission is hereby vested with power and au-
thority and it is hereby made its duty to supervise and
regulate the transportation of property for compensation
or hire by motor vehicle on any public highway in this
State, to fix, prescribe or approve the maximum or mini-
mum or maximum and minimum rates, fares and charges of each
motor carrier in accordance with the specific provisions
herein contained." It will be observed that in this pro-
vision of the statute the term "motor carrier" is used and
not "common carrier" or "contract carrier." Looking to the
definition of motor carrier as hereinabove set forth we
find that a motor carrier means any person, firm, corpora-
tion, company, co-partnership, association or joint stock
association, and their lessees, receivers or trustees ap-
pointed by any Court whatsoever, owning, controlling, man-
aging, operating or causing to be operated any motor pro-
pelled vehicles used in transporting property for compensa-
tion or hire over any public highway in this State. This
definition, in our opinion, includes both common carrier
and contract carrier. In Section 1-h of Article 911b, above
set forth, the term contract carrier is defined as any motor
carrier as hereinabove defined transporting property for
compensation or hire over any highway in this State other
than as a common carrier. Bearing this definition in mind
it is our opinion that Section 4-a, above set forth, applies
both to common carriers and contract carriers alike and that
construing same in connection with Section 6-aa of Article

Honorable James E. Kilday, Director, Page 5

911b, above set forth, that Section 6-aa places a mandatory obligation on the Railroad Commission to prescribe the minimum rate of contract carriers but does not prohibit by its terms the Commission from putting a ceiling on maximum rates to be charged by contract carriers. Therefore, under the general powers given to the Commission and made its duty under Section 4-a, above set forth, the Commission would have the power, should it elect to exercise same, to regulate contract carriers to the extent of putting a ceiling on the rates to be charged by them. It is our opinion that Sections 2, 3 and 4 of Article 911b apply to both contract carriers and common carriers alike except in those provisions expressly therein restricted to one or the other.

In the case of Texas Pacific Railway Company, et al v. Railroad Commission, et al, (Civ. App. Austin, 1940) 138 S. W. (2d) 927, the following is said:

"The 1931 Act was obviously intended to cover and regulate every character of motor carriage of freight for hire over the highways. It denominates one class of carrier as 'common carriers' though it nowhere undertakes to define that term; and the other class as 'contract carriers' which it defines as any such motor carrier other than a common carrier. The definition of the term 'motor carrier' in subdivision g, Section 1 of the Act, is clearly comprehensive enough to include within that term any and every class or type of carrier for hire over the highways of the State." (Underscoring ours)

Further quoting from said opinion on page 930 we find the following:

" . . . And where authorized contract carriers operate in competition with common carriers the Commission must prescribe minimum rates, fares and charges for such services which must not be lower than those prescribed for common carriers for substantially the same service. See Sec. 6-aa." (Underscoring ours)

Honorable James E. Kilday, Director, Page 6

Further quoting from page 930 of the opinion in this case we find:

"Section 4 of the Act also makes it the duty of the Commission in the regulation of authorized transportation for hire over the highways, among other things, 'to fix, prescribe or approve the maximum or minimum or maximum and minimum rates, fares and charges of each motor carrier' in accordance with the other provisions of the Act."(Underscoring ours)

It is our opinion that this law was designed to correlate all of the State's transportation agencies. It is made the duty of the Commission to carefully preserve and foster transportation in all of its forms in the interest of the public and the contract carrier is entitled to the same protection under the law and under the rules and regulations of the Commission as a common carrier. This construction is borne out by the declaration of policy contained in the Act being Section 22-b thereof which is as follows:

"Declaration of Policy. The business of operating as a motor carrier of property for hire along the highways of this State is declared to be a business affected with the public interest. The rapid increase of motor carrier traffic, and the fact that under existing law many motor trucks are not effectively regulated, have increased the dangers and hazards on public highways and make it imperative that more stringent regulation should be employed, to the end that the highways may be rendered safer for the use of the general public; that the wear of such highways may be reduced; that discrimination in rates charged may be eliminated; that congestion of traffic on the highways may be minimized; that the use of the highways for the transportation of property for hire may be restricted to the extent required by the necessity of the general public, and that the various transportation agencies of the State may be adjusted and correlated so that public highways may serve the best interest of the general public."

Honorable James D. Kilday, Director, Page 7

The right of the State to regulate common carriers and contract carriers is sustained in the case of Stephenson v. Binford, 53 Fed. (2d) 509, wherein the constitutionality of the Act now under discussion was in question. It is said in this case:

"Of all the problems pressing upon the state, none present more comprehensive, more far-reaching, more troublesome aspects than do those arising from the effect upon the established common carrier transportation services by rail and road, of the rapidly increasing use of the highways for the carriage of freight for hire by persons assuming the real or pretended status of private contract carriers, and asserting their business to be unregulable. These problems have been attacked in most, if not all, of the states by statutes which, differing in unsubstantial particulars, have been influenced by and have presented the same general theory, given full and definite expression by the Supreme Court of California in Frost v. Railroad Commission of State of California, 197 Cal. 230, 240 P. 26, that, since states may exclude carriers for hire whether common or contract altogether from the public roads, it may affix conditions upon their use of them." (Underscoring ours)

Again quoting from the same opinion on page 514 we find the following:

"Standing out in decisions, text-books, and law articles is the universally accepted doctrine that the use of public roads for the conduct of business thereon, whether by common or by private carriers, is an extraordinary use, and as such is enjoyed, not as a right, but as a privilege. . ."

The above case reached the Supreme Court of the United States and was there affirmed, 287 U. S. 251; 77 L. Ed. 288; 53 S. Ct. 181; 87 A. L. R. 721.

We are not unmindful of the fact that in the opinion by the Supreme Court of the United States in discussing Section 6-aa of Article 911b the following is said:

Honorable James E. Kilday, Director, Page 8

"The authority is limited to the fixing of minimum rates. The contract carrier may not charge less than the rates so fixed, but is left free to charge as much more as he sees fit and can obtain."

But in making this statement the Supreme Court had in mind only Section 6-aa of said article and was discussing same as to the constitutionality alone and not construing the whole Act as we are here doing. Therefore, in our opinion, the above quotation from the opinion of the Supreme Court is merely dicta and were the matter presented to it from the angle here under discussion such would not be the holding of said court.

Our attention has been called to a prior opinion of this department in a letter to the Honorable C. V. Terrell of date February 25, 1932, wherein the following is said:

"It will be observed that in the case of contract carriers, the Commission is empowered to fix minimum rates only."

This same broad statement is made in another opinion by this department to Honorable C. V. Terrell of date February 4, 1932. Again in Opinion No. O-3485, referred to in your letter, the following is said:

"Your first question was the subject of two opinions of the Attorney General addressed to Honorable C. V. Terrell, Chairman of the Railroad Commission of Texas, dated February 4, 1932, and February 25, 1932, and with which opinions we substantially agree. . . ."

In all of these opinions the question under consideration was the basis to be used in fixing minimum rates of contract carriers under the provisions of Section 6-aa of Article 911b and not whether or not the Commission had the power to place a ceiling on rates charged by contract carriers. Insofar as these opinions, or any statement therein, hold that the Commission does not have the power to place a ceiling on rates charged by contract carriers we expressly overrule same.

From a consideration of all of the provisions of the Motor Carriers Act, construing its declaration of policy

Honorable James D. Kilday, Page 9

as contained in Section 22-b, above quoted, in connection
with Section 6-aa with reference to contract carriers spe-
cifically and Section 4-a dealing with motor carriers gen-
erally, we have come to the conclusion and you are there-
fore advised that the Railroad Commission of Texas does have
the power, should it desire to so exercise the same, to put
a ceiling on rates charged by contract carriers operating
on the highways of this State.

     Trusting that this fully answers your question,
we are

                  Yours very truly

                  ATTORNEY GENERAL OF TEXAS

APPROVED OCT 1, 1941

                  By Douglas K. Bergman
FIRST ASSISTANT                Assistant
ATTORNEY GENERAL

DKB:LM

APPROVED OPINION COMMITTEE